# EXHIBIT B

# PLAINTIFF'S COMPLAINT

DO NOT ISSUE WRIT OUT OF STATE DEFENDANTS

IN THE COURT OF COMMON PLEAS
OF ALLEGHENY COUNTY, PENNSYLVANIA
CIVIL DIVISION

Thomas W. Beatty,
    Plaintiff,

      v.

Equifax Information Services LLC;
Experian Information Solutions, Inc. and
Trans Union LLC,
    Defendants.

Case No.   GD-19-008874

TYPE OF PLEADING:

**COMPLAINT IN CIVIL ACTION**

FILED UPON BEHALF OF:
Thomas W. Beatty,
Plaintiff

COUNSEL OF RECORD
FOR THIS PARTY:
Clayton S. Morrow, Esquire
PA. I.D. 53521

**Morrow & Artim, PC**
7th Floor Mitchell Building
304 Ross Street
Pittsburgh, PA 15219
Telephone (412) 281-1250
Direct (412) 209-0656
csm@ConsumerLaw365.com

Pro hac vice admission to be sought:

**GOOLSBY LAW OFFICE, LLC**
John H. Goolsby, Esquire
Minnesota Bar Number 0320201
475 Cleveland Ave N, Suite 212
Saint Paul, MN 55104
Phone (651) 646-0153
jgoolsby@goolsbylawoffice.com

JURY TRIAL DEMANDED

IN THE COURT OF COMMON PLEAS
OF ALLEGHENY COUNTY, PENNSYLVANIA
CIVIL DIVISION

Thomas W. Beatty,                    Case No.    GD-19-008874
     Plaintiff,

        v.

Equifax Information Services LLC;
Experian Information Solutions, Inc. and
Trans Union LLC,
     Defendants.

## **PRELIMINARY STATEMENT**

1.     This Fair Credit Reporting Act ("FCRA") action for damages involves Plaintiff's ordeal in dealing with a recurring problem at the three major credit bureaus:   the merging of two consumers' credit files.   Each Defendant's long history of creating "mixed files" has been the subject of numerous private lawsuits and multiple government enforcement actions over a span of more than twenty years.   Plaintiff's claims are based on Defendants' false reporting on Plaintiff's credit reports, failures to follow reasonable procedures for accuracy, failures to conduct reasonable investigations of disputed information, failures to provide Plaintiff with copies of his credit reports, and impermissible dissemination of Plaintiff's information to creditors who sought credit reports on the other consumer.

## PARTIES

2.     Plaintiff Thomas W. Beatty is a natural person who resides in the city of New Kensington, County of Allegheny, State of Pennsylvania, and is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

3.     Defendant Equifax Information Services, LLC ("Equifax") is a credit bureau doing business in Pennsylvania and is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

4.     Defendant Experian Information Solutions, Inc. ("Experian") is a credit bureau doing business in Minnesota and is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

5.     Defendant Trans Union LLC ("Trans Union") is a credit bureau doing business in Minnesota and is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

## FACTUAL ALLEGATIONS

6.     This is a case of defendant credit bureaus creating mixed files.

7.     A mixed file is a situation where a consumer reporting agency ("CRA") such as Equifax, Experian, or Trans Union places information relating to one consumer in the credit file of another, thus creating false descriptions of both consumers' credit histories in their respective credit reports.

8.     Mixed files occur most often when two or more consumers have similar names, Social Security numbers, or other identifiers (for example, when information relating to John J. Jones is put in John G. Jones' file).

9. Mixed files occur largely because CRAs' computers do not use sufficiently rigorous thresholds to match consumer data precisely, even when such unique identifiers as Social Security numbers are present: for example, Equifax relies on a match of only seven of nine digits of the SSN.

10. Creditors furnish information on their credit and collection accounts to Equifax, and each account record or "tradeline" will include identifying information such as name, Social Security number, address, and birth date. Equifax organizes furnisher records into "files," which refer to all credit accounts and other information that Equifax deems as belonging to the same person. Upon receipt of each account tradeline, Equifax uses an automated matching system that has been preprogrammed with defined rules. The Equifax computer attempts to find in its database the existing credit file that most closely matches the identifying information in the reported tradeline. An account with the same full Social Security number, consumer name, and address as an existing file would constitute a perfect match, but Equifax will allow a tradeline that only constitutes a partial match to be reported to a file.

11. As explained by the Federal Trade Commission, CRAs have a financial incentive for over-inclusive matching procedures:

> When Congress passed the FCRA, it was responding in part to consumer concerns that the CRAs overemphasize completeness at the expense of accuracy. Many of the CRAs' customers are lenders, whose main concern in consulting a consumer report is assessing the likelihood that a borrower will default. For many lenders, the loss incurred when a borrower defaults is much larger than the profit earned

5

when a borrower repays a loan. Because of this, lenders may prefer to see all potentially derogatory information about a potential borrower, even if it cannot all be matched to the borrower with certainty. This preference could give the CRAs an incentive to design algorithms that are tolerant of mixed files, which could harm consumers to whom derogatory information is mistakenly assigned.

Fed. Trade Comm'n, Report to Congress Under Sections 318 and 319 of the Fair and Accurate Credit Transactions Act of 2003, 47 (Dec. 2004).

12. Mixed files can be hard for consumers to detect: a mixed file can look like identity theft, and indeed Plaintiff in this case believed for some time that he was a victim of identity theft.

13. As experts have explained, not only do the CRAs have an incentive to be over-inclusive, but also they have little marketplace counter-incentive to exercise care with respect to avoiding and correcting inaccuracies generally:

> [T]he credit reporting industry is unlike most other industries in some fundamental respects. . . . .[T]he paying clients of the credit reporting industry are not consumers, but the creditors who furnish or use the information contained in the credit bureaus' databases. . . .
>
> [C]onsumers have no say in whether their information is included in the credit bureaus' databases. . . . . Thus, unlike almost all other business relationships, consumers who are unhappy with the actions of a credit bureau cannot vote with their feet – they cannot remove the information or take their business elsewhere.
>
> Creditors, in contrast, do have the ability to switch between credit bureaus if they wish. . . . Credit bureaus have no interest in deferring to a consumer involuntarily captured in a relationship with the bureau, when doing so could cause its paying customer to lose collection opportunities and profits. Both furnishers and credit bureaus also benefit from a system that allows them to spend only seconds on a

> dispute rather than the time (even if minimal) required to
> actually resolve it.
>
> Thus, traditional competitive market forces provide
> little incentive for credit bureaus to incur the costs of
> instituting new procedures that ensure information is
> accurate or to undertake investigations to correct errors . . . .
> Only the FCRA itself compels such behavior.
>
> However, the risk of an occasional FCRA lawsuit
> appears not to have overcome these economic incentives.
> The result is persistent inaccuracies in credit reports . . . .
> Until the failure to conduct a real investigation becomes
> more expensive than the savings from these cost reducing
> measures, the current system will remain broken.

Chi Chi Wu, National Consumer Law Center, *Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in Their Credit Reports (Jan. 2009)* https://www.nclc.org/images/pdf/pr-reports/report-automated_injustice.pdf .

14. At least until recently, when information is disputed to, for example, Equifax, the company has spent less than $1 to process each dispute, despite the fact that failure to correct inaccurate information could cost consumers thousands of dollars and countless hours of aggravation.

15. The "investigation" process is largely automated, and at least until recently, Equifax outsourced the human part of the investigation to contractors in Costa Rica, India, or the Philippines.

16. Equifax and the other CRAs have been on notice from numerous cases of the ongoing problem of mixed files.

17. Government agencies have also repeatedly put Defendants on notice of their shortcomings with respect to mixed files and have repeatedly attempted to get Defendants to take greater care with respect to

accuracy: for example, in the 1990s, an FTC investigation of Equifax resulted in a consent order addressing a number of problems, including mixed files. *See In the Matter of Equifax Credit Information Services, Inc.,* 120 F.T.C. 577, 1995 WL 17012660.

18. The 1995 Equifax Consent Order ordered:

> That Equifax, in connection with the collection, preparation, assembly, maintenance and furnishing of consumer reports and files, forthwith cease and desist from failing to:
> ...
> 4. Follow reasonable procedures to assure maximum possible accuracy of the information concerning the consumer about whom the consumer report relates, as required by Section 607(b) of the FCRA [15 U.S.C. § 1681e(b)]. Such procedures shall include but are not limited to reasonable procedures:
> ...
> > b. To prevent reporting to subscribers that credit information pertains to a particular consumer unless Equifax has identified such information by at least two of the following identifiers: (i) the consumer's name, (ii) the consumer's Social Security number, (iii) the consumer's date of birth, (iv) the consumer's account number with a subscriber or a similar identifier unique to the consumer; [with exceptions that do not apply]
> > ...
> > d. To prevent furnishing any consumer report containing information that Equifax knows or has reason to believe is incorrect, including information that the consumer or the source or repository of the information has stated is not accurate (including that it does not pertain to the consumer) unless Equifax has reason to believe that the statement is frivolous or irrelevant or, upon investigation, not valid;
> > e. To avoid the occurrence of mixed files, including but not limited to mixing of files as the result of entry of data by subscribers when seeking consumer reports.

*Id.* at 586-87.

19. Similarly, an FTC investigation of TRW (now known as Experian) resulted in a consent order addressing a number of problems, including mixed files. *See FTC v. TRW INC.*, 784 F.Supp. 361 (N.D. Tex. 1991).

20. The 1991 Experian Consent Order enjoined Experian (then known as TRW)

> from failing to:
> 1. Maintain reasonable procedures to prevent the occurrence or reoccurrence of Mixed Files, including but not limited to:
>> a. Continuing its current efforts to improve its information gathering, storing, and generating systems to reduce the occurrence of Mixed Files, through modification of its software system to enable such system to accommodate and use, for matching and identification purposes, a Consumer's Full Identifying Information.

*Id.* at 362.

21. "Full Identifying Information" was defined as, "full last and first name; middle initial; full street address; zip code; year of birth; any generational designation; and social security number." *Id.*

22. Similarly, and action brought by seventeen state attorneys general against Trans Union resulted in a consent order addressing a number of problems, including mixed files. *See Alabama v. Trans Union Corp.*, Civil Action No. 92C 7101 (N.D. Ill. Oct. 26, 1992).

23. In the 1992 Trans Union Consent Order, Trans Union agreed to "Implement or continue to utilize and maintain reasonable procedures to avoid the occurrence or reoccurrence of Mixed Files."

24. Defendants have known about the mixed file problems caused by partial SSN matches for over twenty-five years, yet apparently have not substantially changed their practices.

25. Defendants have violated the terms of the 1990s consent orders.

26. Defendants mixed Plaintiff's credit file with that of a different person, whose name is Thomas Ockree.

27. Plaintiff and Mr. Ockree have the same first name and live in the same zip code, but have different middle and last names, different addresses, and different – albeit similar – social security numbers.

28. Plaintiff has never gone by "Thomas Ockree" or "Thomas J. Ockree."

29. In emails dated February 15, 2018, Plaintiff was notified by his credit monitoring service that Trans Union had prepared credit reports on him for multiple lenders.

30. Plaintiff was not aware of any reason that his credit report would have been accessed by lenders.

31. Plaintiff obtained his Trans Union credit report.

32. Plaintiff's February 2018 Trans Union credit report contained accounts that belonged to Plaintiff, but also contained numerous accounts that did not belong to Plaintiff.

33. Mr. Beatty attempted to correct the report by submitting a copy of his birth certificate. Mr. Beatty was assured that the errors would be corrected within 30 days.

34. Plaintiff obtained a copy of his April 6, 2018, Equifax credit report.

35. Plaintiff's April 6, 2018, Equifax credit report contained accounts that belonged to Plaintiff, but also contained numerous accounts that did not belong to Plaintiff, including without limitation a First National Bank account.

36. When Plaintiff first saw all those strange accounts in his credit report, he naturally assumed he was a victim of identity theft.

37. Plaintiff's April 6, 2018, Equifax credit report included Plaintiff's address, but also included numerous addresses that have never belonged to Plaintiff.

38. Plaintiff's April 6, 2018, Equifax credit report gave Plaintiff's name, but immediately underneath stated, "Formerly known as THOMAS J OCKREE."

39. Plaintiff has never gone by "Thomas J. Ockree" or "Thomas Ockree."

40. Plaintiff's April 6, 2018, Equifax credit report stated that there was a Social Security Number "variation."

41. In or around April 2018, Plaintiff also tried to get his credit reports from Experian and Trans Union.

42. At that time, Plaintiff's credit reports contained information that belonged to Mr. Ockree.

43. When Plaintiff tried to get his credit reports from Experian and Trans Union, Experian and Trans Union asked Plaintiff security questions based on information in Plaintiff's file that actually belonged to Mr. Ockree.

44. Because Plaintiff was unable to answer the security questions based on Mr. Ockree's information, Experian and Trans Union did not give Plaintiff copies of his credit reports.

45. Plaintiff hired attorney Ryan Daniel Very.

46. In a letter dated June 21, 2018, Plaintiff, through attorney Very, disputed to Equifax, Experian, and Trans Union.

47. Attorney Very clearly indicated that he represented Thomas W. Beatty and that the dispute was on Beatty's behalf.

48. The June 2018 dispute listed the accounts that did not belong to Plaintiff, appeared on Plaintiff's Equifax credit report, and also presumably were in Plaintiff's Experian and Tran Union files at that time, including without limitation the First National Bank account.

49. The June 2018 dispute explained that the accounts Plaintiff was disputing were apparently opened by Thomas Ockree, and that Plaintiff may have been a victim of identity theft.

50. Very received a letter from Equifax dated July 1, 2018, apparently in response to his dispute of June 21.

51. Equifax's July 1 letter to Very indicated:

Re:
THOMAS J OCKREE
33 INDIAN FIELDS TRL
NEW KENSINGTON PA 15068-9700

52. Very has never represented Thomas Ockree.

53. Plaintiff has never resided at 33 Indian Fields Trl.

54. Equifax's July 1, 2018, letter stated, "We have been unable to locate the requested file in our database."

55. In a letter dated July 11, 2018, Plaintiff, through attorney Very, again disputed to Equifax.

56. Very's July 11 dispute letter stated, "I represent Mr. Thomas W. Beatty. ... Please be advised, once again, that Mr. Beatty is not Mr. Ockree."

57. The July 11 dispute listed the accounts that did not belong to Plaintiff but appeared on Plaintiff's Equifax credit report.

58. Plaintiff's July 11, 2018, dispute package included Plaintiff's Social Security Number, a copy of his birth certificate, and a copy of a utility bill with his current address.

59. In a letter dated July 20, 2018, Plaintiff, through attorney Very, yet again disputed to Equifax.

60. The July 20 dispute listed the accounts that did not belong to Plaintiff but appeared on Plaintiff's Equifax credit report.

61. Plaintiff's July 20, 2018, dispute package again included a copy of Plaintiff's birth certificate and a copy of a utility bill with his current address.

62. Very received a response from Equifax dated July 30, 2018.

63. Equifax's July 30 letter stated, "We have been unable to locate the requested file in our database," and asked that identifying documents be provided.

64. In a letter dated August 6, 2018, Very yet again informed Equifax that he represented Thomas W. Beatty and provided Beatty's Social Security Card and driver's license, showing his current address and date of birth.

65. Very received a response from Equifax dated August 13, 2018.

66. Equifax's response was addressed to:

RYAN DANIEL
500 GRANT ST STE 2900
PITISBURGH, PA 15219-2502
RE: Thomas J Ockree

67. Not only did Equifax incorrectly reference Mr. Ockree instead of Plaintiff but also Equifax failed to even get Very's name right, omitting his last name.

68. Equifax provided a credit report, dated August 13, 2018, that included a mix of Plaintiff's and Mr. Ockree's information.

69. The August 13, 2018, mixed credit report stated, "Name On File: Thomas J Ockree ... Formerly Known As: Thomas W Beatty."

70. The August 13, 2018, mixed credit report showed Plaintiff's Social Security Number, but also included a similar Social Security Number that is not his as a "Social Security # Variation." Upon information and belief, the other Social Security Number is Mr. Ockree's.

71. Plaintiff received a credit report from Experian, dated July 24, 2018, that contained a mix of Plaintiff's and Mr. Ockree's information.

72. Plaintiff was able to obtain a copy of his October 1, 2018, Trans Union credit report through his credit monitoring service.

73. Plaintiff's October 1, 2018, Trans Union credit report included information not belonging to him, including the First National Bank account.

74. On various occasions when Plaintiff has tried to obtain his credit reports (using his own name and Social Security Number), if he has been able to get a report at all, he has received reports that contain various combinations of his own information and what appears to be Mr. Ockree's.

75. Plaintiff has received one or more reports under the name Thomas Ockree that state, "formerly known as Thomas W Beatty."

76. The accounts listed have sometimes been Plaintiff's sometimes not.

77. Plaintiff has been left to wonder what information Equifax, Experian, and Trans Union provide to lenders when they ask for credit reports on Plaintiff or on Mr. Ockree.

78. Upon information and belief, Defendants have disseminated Plaintiff's information to creditors who sought credit reports on Mr. Ockree.

79. Mr. Ockree noticed some of Plaintiff's information, including some of Plaintiff's accounts, in reports he received when he tried to obtain *his* reports.

80. Mr. Ockree believed he was a victim of identity theft and reported the apparent crime to police.

81. Plaintiff became the subject of a police investigation.

82. Plaintiff was contacted by police and questioned as part of their investigation.

83. Plaintiff was frightened, humiliated, and infuriated to be the subject of a police investigation.

84. The police eventually informed Plaintiff that as part of their investigation, they determined that Mr. Ockree has a Social Security Number that differs from Plaintiff's by just one digit.

85. In a letter dated January 2, 2019, Plaintiff yet again disputed the accounts that weren't his to Equifax, Experian, and Trans Union.

86. In his January 2, 2019, dispute, Plaintiff identified himself by his first and last names and middle initial, his address, his Social Security Number, and his date of birth.

87. Plaintiff explained, "It appears that you have mixed up my information with that of a different person, Thomas Ockree, through no fault of his (or mine). I have never gone by 'Thomas Ockree.'"

88. Plaintiff identified the information apparently belonging to Mr. Ockree that should be removed from Plaintiff's credit reports.

89. With his 2019 dispute, Plaintiff enclosed copies of his Social Security Card, his Driver's License, and a recent utility bill with his name and current address.

90. Plaintiff received a response from Equifax dated January 14, 2019.

91. The response was addressed to "Thomas J. Ockree" at Plaintiff's address.

92. The accompanying credit report was under the name "Thomas J. Ockree."

93. In the investigation results addressed to Ockree, Equifax indicated that it was no longer reporting information Plaintiff had disputed; but Equifax did the exact opposite of what was requested: instead of deleting the information Plaintiff had disputed from *Plaintiff's* credit file, Equifax deleted Ockree's information from *Ockree's* file, and sent Plaintiff a copy of *Ockree's* report.

94. Upon information and belief, Equifax separated Ockree's accounts from Plaintiff's, but left Ockree's accounts in the file Equifax maintains under Plaintiff's name, and vice versa.

95. Equifax's investigation results acknowledged that Equifax had "mixed" the files.

96. From February 2018 to the present, Plaintiff disputed to various consumer reporting agencies the information that was not his multiple times, including without limitation the disputes specified herein.

97. Due to Defendants' respective failures to conduct reasonable investigations of Plaintiff's disputes, the false information on Plaintiff's credit reports was not appropriately deleted or modified.

98. Equifax sold credit reports with a mix of Plaintiff's and Ockree's information to subscribers on multiple occasions, including without limitation on August 3, 2018, to Synchrony Bank.

99. Experian sold credit reports with a mix of Plaintiff's and Ockree's information to subscribers on multiple occasions, including without limitation on March 29, 2018, to Cap One.

100. Trans Union sold credit reports with a mix of Plaintiff's and Ockree's information to subscribers on multiple occasions, including without limitation on April 7, 2018, to WebBank.

101. As a result of Defendants' actions and omissions, Plaintiff has suffered actual damages, including without limitation adverse credit actions, out-of-pocket expenses, detriment to his credit rating, and emotional distress.

102. Plaintiff has suffered injuries in fact that are traceable to Defendants' conduct and that are likely to be redressed by a favorable decision in this matter.

103. Specifically, Plaintiff suffered concrete injuries to his reputation as a result of Defendants' communication of false information to third parties.

104. At all times pertinent hereto, Defendants acted by and through their agents, servants and/or employees who acted within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants.

105. Plaintiff, through attorney Very, offered to settle his legal claims against Defendants without litigation.

106. Defendants did not accept Plaintiff's settlement offer.

107. Very no longer represents Plaintiff.

108. Any settlement offers made through attorney Very or his firm are withdrawn.

## TRIAL BY JURY

109. Plaintiff is entitled to and hereby requests a trial by jury.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)

110. Defendants willfully and/or negligently violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's consumer reports.

111. As a result of Defendants' violations of § 1681e(b), Plaintiff has suffered actual damages, including without limitation credit denials, out-of-pocket expenses, detriment to his credit rating, invasion of privacy, and emotional distress. Plaintiff is therefore entitled to recover actual damages pursuant to 15 U.S.C. §§ 1681n and 1681o.

112. Defendants' actions and omissions were willful, rendering them liable for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

113. Defendants are liable for Plaintiff's costs and attorney's fees, pursuant to 15 U.S.C. §§ 1681n and 1681o.

### COUNT II
### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681i

114. Defendants willfully and/or negligently violated 15 U.S.C. § 1681i in multiple ways including without limitation by failing to conduct a reasonable reinvestigation of Plaintiff's dispute(s) and by failing thereafter to appropriately delete or modify information in Plaintiff's file.

115. As a result of Defendants' violations of § 1681i, Plaintiff has suffered actual damages, including without limitation credit denials, out-of-pocket expenses, detriment to his credit rating, invasion of privacy, and emotional distress. Plaintiff is therefore entitled to recover actual damages pursuant to 15 U.S.C. §§ 1681n and 1681o.

116. Defendants' actions and omissions were willful, rendering them liable for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

117. Defendants are liable for Plaintiff's costs and attorney's fees, pursuant to 15 U.S.C. §§ 1681n and 1681o.

**COUNT III**
**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681g**

118. Defendants willfully and/or negligently violated 15 U.S.C. § 1681g by failing to disclose information in Plaintiff's file.

119. As a result of Defendants violations of § 1681g, Plaintiff has suffered actual damages, including without limitation credit denials, out-of-pocket expenses, detriment to his credit rating, invasion of privacy, and emotional distress. Plaintiff is therefore entitled to recover actual damages pursuant to 15 U.S.C. §§ 1681n and 1681o.

120. Defendants' actions and omissions were willful, rendering them liable for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

121. Defendants are liable for Plaintiff's costs and attorney's fees, pursuant to 15 U.S.C. §§ 1681n and 1681o.

**COUNT IV**
**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. § 1681b(a)**

122. Defendants willfully and/or negligently violated 15 U.S.C. § 1681b(a) by providing Plaintiff's credit information to entities that sought to obtain Ockree's credit reports and had no permissible purpose for Plaintiff's credit report.

123. As a result of Defendants' violations of § 1681b(a), Plaintiff has suffered actual damages, including without limitation invasion of privacy, and emotional distress. Plaintiff is therefore entitled to recover actual damages pursuant to 15 U.S.C. §§ 1681n and 1681o.

124. Defendants' actions and omissions were willful, rendering it liable for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

125. Defendants are liable for Plaintiff's costs and attorney's fees, pursuant to 15 U.S.C. §§ 1681n and 1681o.

**WHEREFORE,**

Plaintiff prays that judgment be entered against these Defendants for:

a.) Plaintiff's actual damages;

b.) Punitive and/or statutory damages pursuant to 15 U.S.C. § 1681n;

c.) Reasonable attorney's fees and costs pursuant to 15 U.S.C. §§ 1681n and/or 1681o;

d.) Such other and further relief as may be just and proper; and

e.) Seeks an amount in excess of Arbitration limits.

**PLAINTIFF, Thomas W. Beatty,**

By: */s/ Clayton Morrow*
Clayton Morrow, Esquire

**JURY TRIAL DEMANDED**

**MORROW & ARTIM, PC**
Clayton S. Morrow, Esquire
PA I.D. 53521
304 Ross Street
Mitchell Building, 7th Floor
Pittsburgh, PA 15219
General Office Phone (412) 281-1250
Direct Phone (412) 209-0656

csm@ConsumerLaw365.com